UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

KATHLEEN GALLEGOS,                                          **REPORT**
                                                                                    **and**
                                            Plaintiff,              **RECOMMENDATION**

                        v.
                                                                            **04-CV-773A(F)**

TOP RX, INC.,
KENNY KING, Individually and d/b/a
TOP RX PHARMACEUTICALS,

                                            Defendants.

_____

APPEARANCES:              HARRIS BEACH LLP
                                     Attorneys for Plaintiff
                                     RICHARD T. SULLIVAN, of Counsel
                                     726 Exchange Street, Suite 1000
                                     Buffalo, New York 14210

                                     GROSS, SHUMAN, BRIZDLE & GILFILLAN
                                     Attorneys for Defendants
                                     HUGH C. CARLIN, of Counsel
                                     600 Lafayette Court
                                     Buffalo, New York 14203


## JURISDICTION

        This action was referred to the undersigned by the Honorable Richard J. Arcara

on June 15, 2006 for all pretrial matters (Doc. No. 27).  The matter is presently before

the court on Defendants' motion for summary judgment, filed September 15, 2006 (Doc.

No. 31).

**BACKGROUND**

Plaintiff, Kathleen Gallegos ("Plaintiff" or "Gallegos"), commenced this action in New York State Supreme Court on August 25, 2004, seeking relief for common law breach of contract and fraud, and, under the New York Human Rights law ("NYHRL § 291, *et. seq.*" or "NYHRL"), for hostile work environment, gender discrimination and retaliation (Doc. No. 1); *see also* Doc. No. 1, Exh. A ("Verified Complaint") ¶¶ 23-62. Plaintiff seeks judgment against Defendants including compensatory damages, back pay, front pay, pre-judgment interest, attorney's fees and costs and disbursements related to this action.  Verified Complaint ¶ 62.  On September 24, 2004, Defendants removed the action to this court (Doc. No. 3).  Defendants filed their answer with counterclaims on October 1, 2004 (Doc. No. 4) ("the answer").  Plaintiff filed her answer to Defendants' counterclaims, with affirmative defenses, on November 3, 2004 (Doc. No. 7).

On September 15, 2006, Defendants filed the instant motion for summary judgment directed to each of Plaintiff's claims as alleged in the Verified Complaint (Doc. No. 31) ("Defendants' motion").  In support, Defendants filed the Affidavit of Kenny King (Defendants' motion, Attachment #1) ("King Affidavit"); Defendants' LR 56.1(a) Statement of Material Facts Defendants Contend There is No Genuine Issue ("Defendants' Fact Statement"); the Affidavit of Scott Franklin (Defendants' motion, Attachment #2) ("Franklin Affidavit"); a Memorandum of Law in Support of Defendants' Motion for Summary Judgment (Defendants' Motion, Attachment #3) ("Defendants' Memorandum"), along with an Appendix of Exhibits A - I in Support of Defendants' motion (Defendants' motion, Attachment #4) ("Defendants' Exh(s).____").  Defendants'

2

Exhs. H and I are copies of the transcripts of Plaintiff's depositions conducted October 19, 2005 ("Plaintiff's Deposition I") and February 16, 2006 ("Plaintiff's Deposition II"), respectively.

In opposition to Defendants' motion, Plaintiff, on November 3, 2006, filed the Affidavit of Kathleen Gallegos ("Gallegos Affidavit") together with Exhibits A (the summons and verified complaint) and B (letter from Defendant Kenny King received by Plaintiff in March 2001) and Exhibits C and D (Doc. No. 36) (together "Top Rx Inventory Reports" for 1999 and 2001, respectively), Exhibits E and F (Doc. No. 37) ("Plaintiff's Deposition I" and "Plaintiff's Deposition II," respectively) ("Plaintiff's Exh(s). ___"), the Affidavit of Michael Duke ("Duke") in Opposition to Defendants' Motion ("Duke Affidavit") (Doc. No. 38-1) and a Memorandum of Law in Opposition to Defendants' Motion  (Doc. No. 38-2) ("Plaintiff's Memorandum").  On November 22, 2006, Defendants filed a Reply Memorandum in Support of Defendants' Summary Judgment Motion ("Defendants' Reply") with an attached exhibit ("Defendants' Reply Exh. A") ("Letter Re: Plaintiff's Response to Interrogatories and Demand for Production") (Doc. No. 39).  Oral argument was deemed unnecessary.

Based on the following, Defendants' motion, limited to Plaintiff's breach of contract claim,[1] should be DENIED, and, as directed to Plaintiff's other claims, Defendants' motion should be DISMISSED without prejudice.

---

[1]  Except for her breach of contract claim based on Defendants' underpayment of sales commissions earned by Plaintiff, Plaintiff intends to discontinue all causes of action alleged in the Verified Complaint.  Plaintiff's Memorandum at 2.  At present, no stipulation of discontinuance has been filed by Plaintiff.

**FACTS** [2]

Defendant, Kenny King ("Mr. King" or "King") is the Chief Executive Officer of Defendant Top Rx, Inc. ("Defendant Top Rx" or "Top Rx"), a business headquartered in Tennessee which distributes generic pharmaceuticals, or drugs, to pharmacies for retail sale. Defendants' Fact Statement ¶¶ 1-2, 4.  From May 13, 1991 through January 21, 2004, Plaintiff was employed by Defendants as a pharmaceutical sales representative and sales manager.  Verified Complaint ¶ 8.[3]  Plaintiff was initially hired by Top Rx as an independent contractor and, in 1998, Plaintiff became Top Rx's employee.  Plaintiff's Deposition I at 24; Gallegos Affidavit ¶ 7; King Affidavit ¶ 3.  Plaintiff, who previously worked for VIP Pharmaceuticals, also a generic pharmaceutical sales company, left that company to work for Top Rx after King represented in a March 2001 letter to Plaintiff, Plaintiff's Deposition I at 14-15, that she could earn considerably more with Top Rx while working from her home, and receive a salary of $26,000 for one year, the amount she had been earning as a VIP employee.  Plaintiff's Deposition I at 17-18.  From 1999 through 2003, Plaintiff's annual compensation while employed by Top Rx was between $160,000 and $240,000.  Defendants' Exh. E.  Despite Mr. King's invitation to do so, Defendants' Exh. A at 8,  Plaintiff did not enter into a formal written contract regarding the terms of her employment or compensation with Top Rx prior to commencing employment with Top Rx. Defendants' Fact Statement ¶ 7 (referencing Plaintiff's

---

[2]  Taken from the pleadings and motion papers filed in this action.

[3]  Allegations of fact in verified complaints may be considered as evidence for purposes of deciding summary judgment motions in federal civil actions.  *See Martinez v. Rosado,* 614 F.2d 829, 830 n. 1 (2d Cir. 1980); *Cassells v. Univ. Hosp. at Stony Brook,* 1987 WL 17091, at *4 (E.D.N.Y. Sept. 10, 1987); *Forts v. Malcolm,* 426 F.Supp. 464, 466 (S.D.N.Y. 1977) (verified pleadings qualify as affidavits required by Rule 56(e) if the verified pleadings meet the requirements of Rule 56(e)).

Deposition I at 18).  In March of 1991, prior to commencing work for Top Rx, King sent Plaintiff a letter offering Plaintiff employment with Top Rx which urged Plaintiff to accept King's proposal and described the terms of employment with Top Rx.  Gallegos Affidavit ¶ 7; Plaintiff's Exh. B; Defendants' Exh. A.  In his employment proposal to Plaintiff, King represented Plaintiff would, for purposes of computing her commission,  be "working off . . . the average cost," or "last cost" of the drugs sold to Defendants, that "[a]ll information would be within [Plaintiff's] hands, not hidden from [Plaintiff]," and that Plaintiff could "make her own prices and not turn down orders."  Verified Complaint ¶¶ 10-12 (quoting Plaintiff's Exh. B).  In the letter, King also stated that Plaintiff's commissions were to be determined on the difference between a Top Rx's drug's sales price and its "average cost," and that "the computer automatically averages cost everytime we [Top Rx] buy new stock at a different price," and that "standard cost" would be irrelevant to computation of Plaintiff's sales commissions.  Plaintiff's Exh. B at 2.  Plaintiff testified at her deposition she understood "standard cost" to mean "what normally it would be to acquire the product."  Plaintiff's Deposition I at 21-22.  Plaintiff also stated she was aware Top Rx considered rebates, received by Top Rx from its suppliers, in determining the cost of pharmaceuticals to Top Rx, Plaintiff's Deposition I at 22, but believed such rebates would lower Top Rx costs.  Plaintiff's Deposition I at 23.

Prior to hiring Plaintiff, King provided Plaintiff with an example of Top Rx's product catalog ("the catalog" or "Weekly Buyer Worksheet"), which were distributed weekly to Top Rx salespeople and contained the average cost and suggested prices of Top Rx products available for sale.  Defendants' motion ¶ 9 (referencing King Affidavit ¶

5; Plaintiff's Deposition II at 10-12; Defendants' Exh. B).  King also provided Plaintiff

with handwritten notes and explanations of the catalog, Defendants' motion ¶ 8

(referencing Defendants' Exh. A; Plaintiff's Deposition I at 13-14; King Affidavit ¶ 14),

explaining that Plaintiff would work off the average cost column on the Weekly Buyer

Worksheets to calculate her commissions on product sales.  Defendants' motion ¶¶ 11-

12 (referencing King Affidavit ¶ 7; Defendants' Exh. A; Plaintiff's Deposition II at 12-11;

Defendants' Exh. B).  During Plaintiff's employment with Top Rx, all Top Rx

salespersons' commissions, including Plaintiff's, were based on the difference between

the price at which the salespersons sold a particular Top Rx product and the average

cost of the product as stated in the catalog or Weekly Buyer Worksheet.  King Affidavit

¶¶ 7,9; Defendants' Exh. B; Plaintiff's Deposition II at 12.  According to Defendants, the

average cost of Top Rx's products as listed in the catalog was determined by

accounting for several factors, including the "actual" purchase cost of the product to Top

Rx, rebates, market conditions, broker commissions, and quantities and expiration

dates for its products available for sale.  Defendants' Memorandum at 4 (referencing

King Affidavit ¶ 7; Franklin Affidavit ¶ 3; Plaintiff's Deposition II at 10-11).  While Plaintiff

was employed by Top Rx, Plaintiff's sales commission equaled one-third of the

difference between the price at which Plaintiff sold a Top Rx product and the average

cost of the respective Top Rx product listed in the catalog or Weekly Buyer Worksheet.

King Affidavit ¶ 7; Defendants' Exh. A at 2; Plaintiff's Deposition II at 12, 14.  Each

month, Plaintiff calculated her commissions on this basis, and submitted that amount to

Top Rx corporate headquarters in Tennessee for payment.  Plaintiff's Deposition I at 54-

55, 82-83; Plaintiff's Deposition II at 22-23; Defendants' Exh. G.

6

Sometime in 1992 or 1993, Plaintiff became sales manager for the Top Rx sales office in Lewiston, New York.  Plaintiff supervised five to 25 sales employees while maintaining her own sales accounts and, by 1998, Plaintiff was receiving a salary to supplement her commissions which ranged from $9,000 to $18,000.  Gallegos Affidavit ¶ ¶ 7-8; Plaintiff's Deposition I at 60-61.  In addition, Plaintiff received a monthly override on the sales commissions of other salespeople she supervised in the Lewiston office.  Plaintiff's Deposition at 55-56.  On January 7, 1999, along with the other Top Rx sales staff, Plaintiff signed a written employment non-compete agreement which provided, *inter alia,* that "the termination of employee's employment with the Company . . . may be effected by either party at will or without cause."  Defendants' Exh. C ("Employment Agreement"). On June 29, 2001, Plaintiff, as manager of the Top Rx Lewiston sales office, acknowledged receipt of a memorandum from Top Rx, that Top Rx provided to each of its salespersons, which stated

> Several questions have been raised regarding the term "cost" as this term is used in various [Top Rx] documents relating to prices, computation of commissions, etc.  As you know, in the past and in the future, the "cost" of an item is a sum set by management based upon a number of different factors.  This sum may, or may not, equate to the exact cost of the item to the company.

Defendants' Memorandum at 5 (referencing Defendants' Exh.D ("the June 2001 Memorandum") (bracketed material added); Plaintiff's Deposition I at 79.

On December 26, 2003, following a negative performance evaluation, Top Rx demoted Plaintiff from her position as sales manager and, on January 21, 2004, Defendants terminated Plaintiff's employment.  Gallegos Affidavit ¶ 8.  After Plaintiff's termination, Plaintiff observed a copy of Top Rx's True Cost Inventory Report, presumably for 2004, a type of internal Top Rx document she had never seen before.

7

Gallegos Affidavit ¶ 13.  Thereafter, Plaintiff obtained copies of Top Rx's True Cost

Inventory Reports for 1999 and 2002, Plaintiff's Exhs. C and D, which listed, *inter alia,*

the "Total Last," "Total Average" and "Total True" costs of the drugs Top Rx sold in

these years through its sales staff including Plaintiff.  *Id.*  As reflected in these

documents, Plaintiff avers that the "True Cost" was the cost Top Rx paid for the drug

and the "Average Cost" was the cost listed in the Top Rx catalog, which was often

significantly higher than the "True Cost" of the drug as stated in the True Cost Inventory

Report.  Gallegos Affidavit ¶¶ 14-15.  For example, according to the Top Rx True Cost

Inventory Reports for 1999, the "Total True Cost" for all Top Rx drugs held in its

inventory in 1999 was $3,244,914.92, while the cumulative "Total Average Cost," based

on the figures Top Rx provided to Plaintiff and other sales staff in the Weekly Buyer

Worksheets for that year, was calculated at  $4,368,690.44.  *Id.* ¶ 14.  According to

Plaintiff's explanation, the differences in True Cost and Average Cost numbers as

stated in these documents indicates Defendants misstated to Plaintiff (and other Top Rx

sales staff) Top Rx's average costs as published in the Weekly Buyer Worksheets for its

products sold by Plaintiff, and, correspondingly, underpaid Plaintiff's commissions for

these years in amounts varying from 15% to 51%.  Gallegos Affidavit ¶ 14.  Plaintiff thus

avers Defendants deprived Plaintiff of substantial amounts of commissions throughout

her employment because the Top Rx average costs, relating to particular Top Rx

products, provided to Plaintiff by Defendants were significantly increased, without

Plaintiff's knowledge or consent, above Defendants' "actual," King Affidavit ¶ 12 ("the

<u>actual</u> cost paid for the product by Top Rx"), or "true" purchase costs upon which

Plaintiff's commissions were to be computed in accordance with Mr. King's 1991 letter.

*Id.* ¶¶ 12-15 (underlining added).


# DISCUSSION

## 1.    Summary Judgment

Summary judgment will be granted when a moving party demonstrates that there

are no genuine issues as to any material fact and that a moving party is entitled to

judgment as a matter of law.  Fed.R.Civ.P. 56(a) and (b); *Celotex Corp. v. Catrett*, 477

U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Rattner v.*

*Netburn*, 930 F.2d 204, 209 (2d Cir. 1991).  The party moving for summary judgment

bears the burden of establishing the nonexistence of any genuine issue of material fact.

If there is any evidence in the record based upon any source from which a reasonable

inference in the nonmoving party's favor may be drawn, a moving party cannot obtain a

summary judgment.  *Celotex, supra*, at 322.  Nevertheless, "the mere existence of some

alleged factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment; the requirement is that there be no genuine

issue of material fact."  *Anderson, supra*, at 247-48.

Once a party moving for summary judgment has made a properly supported

showing as to the absence of any genuine issue as to all material facts, the nonmoving

party must, to defeat summary judgment, come forward with evidence that would be

sufficient to support a jury verdict in its favor.  *Goenaga v. March of Dimes Birth Defects*

*Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  The court is required to construe the evidence in

the light most favorable to the non-moving party.  *Tenenbaum v. Williams*, 193 F.3d

581, 593 (2d Cir. 1999) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255

(1986)), *cert. denied*, 529 U.S. 1098 (2000).

As noted, Background, *supra*, at 3 n. 1, Plaintiff has stated she intends to

discontinue her causes of action except for Plaintiff's breach of contract claim for

underpayment of commissions.  Gallegos Affidavit ¶ 3; Plaintiff's Memorandum at 2.  To

date, however, no stipulation of discontinuance, pursuant to Fed. R. Civ. P. 41(a)(1)(ii),

directed to Plaintiff's wrongful termination, fraud, or employment discrimination and

retaliation claims, has been filed.  Nevertheless, based on Plaintiff's stated intention,

and Defendants' reliance upon Plaintiff's stated intention to discontinue such claims,

Defendants' Reply Memorandum at 1-2, the court addresses Defendants' motion only

insofar as it requests summary judgment on Plaintiff's breach of contract claim based on

Defendants' alleged miscalculation and underpayment of sales commissions due

Plaintiff in violation of her alleged contract with Defendants, with respect to such

commission computations, and on Defendants' affirmative defenses of waiver and

estoppel.  Answer ¶ 71; Defendants' Memorandum at 10-13; Defendants' Reply

Memorandum at 6-9.  Accordingly, Defendants' motion directed to Plaintiff's non-

contract claims should be DISMISSED as moot without prejudice.


## 2.    Breach of Contract Claim

To establish a breach of contract under New York law,[4] Plaintiff must prove (1) a

valid contract; (2) performance of the contract by one party; (3) breach by the other

---

[4] As this is a diversity action and the parties rely upon New York law, the court applies New York law to the substantive issues.

party; and (4) damages caused by the breach.  *Terwilliger v. Terwilliger,* 206 F.3d 240

245-46 (2d Cir. 2000) (citing New York caselaw).  "There is no enforceable agreement if

the parties have failed to agree on all of its essential terms or if some of the terms are

too indefinite to be enforceable." *Zhao v. State Univ. of N.Y.*, 472 F.Supp.2d 289, 317-

18 (E.D.N.Y. 2007) (citing New York cases).  "[M]ere agreement to agree" in a future

negotiation on a material term of the contract is unenforceable.  *Id.* at 318.  While there

must be a meeting of the minds between the parties as to an agreement's essential

terms, parties "should be held to their promises and courts should not be 'pedantic or

meticulous' in interpreting contract expressions."  *Id.* (citing and quoting *Cobble Hill*

*Nursing Home v. Henry & Warren Corp.,* 548 N.E.2d 203, 483 (N.Y. 1989), *cert denied,*

498 U.S. 816 (1990)).  Under New York law, the terms of a contract are ambiguous only

if "more than one meaning" may be applied "when viewed objectively by a reasonably

intelligent person who has examined the context of the entire integrated agreement and

who is cognizant of the customs, practices, usages and terminology as generally

understood in the particular trade or business."  *Alexander & Alexander Serv., Inc. v.*

*These Certain Underwriters at Lloyd's,*136 F.3d 82, 86 (2d Cir. 1998) (such ambiguity

must be presented to the jury to resolve based on parol evidence) (citing New York

caselaw); *67 Wall St. Co. v. Franklin Nat. Bank,* 333 N.E.2d 184, 186-87 (N.Y. 1975)

(holding where contractual language was ambiguous, trial judge correctly admitted parol

evidence with respect to contracting parties, intent and in allowing trier of fact to resolve

issue); compare *Terwilliger*, 206 F.3d at 245 ("construing an unambiguous contract

provision is a function of the court, rather than a jury, and matters extrinsic to the

agreement may not be considered when the intent of the parties can be fairly gleaned

from the face of the instrument." (underlining added) (citing *Teitelbaum Holdings, Ltd. v.*

*Gold,* 396 N.E.2d 1029 (N.Y. 1979))).  "Where the language used [in a contract] is

susceptible to differing interpretations, each of which may be said to be as reasonable

as another, and where there is relevant extrinsic evidence of the parties' actual intent,

the meaning of the words become an issue of fact and summary judgment is

inappropriate."  *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir.

1992); *see also Alexander & Alexander Serv., Inc.,* 136 F.3d at 86 (citing *Seiden,*

*supra*).

        In support of Defendants' motion, directed to Plaintiff's breach of contract claim,

Defendants contend that no written employment agreement existed between the

parties.  Defendants' Fact Statement ¶ 7.  Defendants further argue that even if Mr.

King's 1991 letter to Plaintiff constitutes an offer of employment with Top Rx,

Defendants' Exh. A, and, together with Plaintiff's acceptance of employment with

Defendants and her performance in reliance on the offer, is found to be an enforceable

contract providing for the computation of Plaintiff's sales commissions while employed

by Top Rx, such agreement as it relates to the proper computation of Plaintiff's sales

commissions was not breached by Defendants.  Defendants' Memorandum at 6-9.

Specifically, Defendants maintain that, as described in Mr. King's 1991 proposal,

Plaintiff was to be paid a commission of one-third of the difference between the average

cost of any Top Rx product, as stated in the Weekly Buyer Worksheet, or "product

catalog," Plaintiff sold and the price at which she sold it.  Defendants' Memorandum at

6; King Affidavit ¶¶ 7, 10, 12; Franklin Affidavit ¶¶ 6-7.  Defendants also insist that

Plaintiff was well-aware before she commenced employment that Top Rx's stated

average cost was based on numerous factors other than Top Rx's purchase cost for a

particular product, including product availability, level of sales, product expiration dates,

lower competitor sales pricing, broker commissions, general market conditions, and

overhead.  Defendants' Memorandum at 4, 7; Defendants' Fact Statement ¶ 17; King

Affidavit ¶¶ 10, 12; Franklin Affidavit ¶ 7.

　　　　To support this factual assertion, Defendants maintain that, while employed by

Top Rx, Plaintiff frequently requested, and Defendants approved, reductions in the

average cost for particular Top Rx drugs to facilitate Plaintiff's sales of such drugs in

order to preserve Plaintiff's ability to earn a substantial commission notwithstanding a

lower sales price proposed by Plaintiff, and the probable and corresponding reduction in

Top Rx's profit margin, or even a loss, on the sale, *i.e.*, the difference between the

average cost for the particular drug and the sales price.  Defendants' Memorandum at

7; King Affidavit ¶¶ 10-11; Franklin Affidavit ¶¶ 5-6, 8.  Defendants also point to

Plaintiff's receipt of the June 2001 Memorandum which, according to Defendants,

confirmed that the average cost of a Top Rx product was determined based on several

factors including purchase cost, and that Defendants' product acquisition cost was not

the sole factor in establishing Top Rx's average cost, as Plaintiff claims.  Defendants'

Memorandum at 9.  Despite Plaintiff's testimony that other Top Rx sales representatives

frequently questioned whether Defendants had arbitrarily increased the average costs

to reduce their respective commissions, Plaintiff's Deposition I at 87-88, Defendants

also represent that all Top Rx sales staff routinely calculated their commissions based on the average costs as stated in the Weekly Buyer Worksheets without voicing objections to Defendants that the average costs had been improperly increased by Defendants thereby unfairly reducing the sales commissions for Top Rx's sales staff at its Lewiston, New York office.  Defendants' Memorandum at 7 (citing Plaintiff's Deposition I at 82-83).  Defendants further assert Plaintiff received, along with Mr. King's 2001 handwritten letter offer, and that Plaintiff does not dispute receiving before starting employment with Top Rx, a copy of Top Rx's catalog showing Top Rx's average costs ("AVG Cost") for its products.  Defendants' Memorandum at 5 (referring to Defendants' Exh. B, a page from Defendants' July 15, 2002 catalog or Weekly Buyers Worksheet, as an example of the Top Rx catalog information provided to Plaintiff in 1991).

Turning to Defendants' contention that no written agreement establishes a contract between the parties, the record demonstrates Mr. King's 1991 letter to Plaintiff states in relevant part that "the cost you [Plaintiff] would be working off of would be average (AVG) cost . . . the computer automatically averages costs everytime we [Top Rx] buy new stock [drugs] at a different price . . .."  Defendants' Exh. A (bracketed material added) (material in parentheses in original), the court finds this argument ignores the relevant issue of whether an enforceable contract exists between the parties.  Fairly read, this document, coupled with Plaintiff's subsequent employment by Top Rx and performance as a sales representative for Top Rx, may be found by a reasonable juror to constitute an enforceable contract of employment.  Defendants do

not argue to the contrary.  Defendants' Memorandum at 9 ("Top Rx promised to pay . . .

Plaintiff commissions . . ..") (underlining added); Defendants' Reply Memorandum at 2

n. 2 (conceding the existence of a material issue of fact regarding whether an

employment contract exists between the parties sufficient to avoid summary judgment).

In any event, applying general principles of New York contract law, the

undisputed evidence that Plaintiff commenced employment with Top Rx following

receipt of Mr. King's letter in March 1991 presents a triable issue of fact as to the

existence of a contract between the parties, regarding Plaintiff's employment,

specifically, the agreed method for computing Plaintiff's sales commissions.  *See*

*McLaughlin v. Gunning*, 517 N.Y.S. 2d 338, 339 (3d Dep't 1986) (letter offer of

employment and plaintiff's commencement of employment raises triable issue of

existence of enforceable offer and acceptance).  While Mr. King's letter invited Plaintiff

to enter into a formal written contract with Top Rx, Defendants' Exh. A at 11,

Defendants do not contend that, absent such written contract, Mr. King's 1991 letter

could not constitute an offer of employment which Plaintiff accepted by her subsequent

employment with Top Rx.  *See Management Recruiters of Boulder v. Nat'l Economic*

*Research Assoc's, Inc.*, 2007 WL 2109478, at *5 (S.D.N.Y. July 24, 2006) (no contract

implied where party reserves right to be bound only upon written executed agreement)

(citing New York caselaw).  Therefore, summary judgment cannot be granted on this

element of Plaintiff's breach of contract claim.

Second, Defendants argue that, even if there is an enforceable agreement

between the parties providing for the exclusive method of computing Plaintiff's sales

commissions, no triable issue exists on this element of Plaintiff's breach of contract

claim.  Specifically, Defendants maintain that the term "average cost" referred to in Mr.

King's 1991 letter, Defendants' Exh. A, is the average cost "listed in the buyer

worksheet," as established by Top Rx, except when Defendants granted Plaintiff, at

Plaintiff's request, a "downward adjustment" of such average cost in Plaintiff's favor to

facilitate prospective sales at a lower sales price than listed in the catalog.  Defendants'

Memorandum at 6 (citing Defendants' Exh. B, as an example of such "buyer worksheet"

sent to Plaintiff along with Mr. King's 1991 letter); King Affidavit ¶ 7.  Thus, according to

Defendants, Plaintiff's one-third commission rate was intended to be computed on the

difference between the average costs of Defendants' products as listed weekly in the

Top Rx "product catalog" or Weekly Buyer Worksheet provided to Plaintiff during her

employment, King Affidavit ¶¶ 10, 12; Franklin Affidavit ¶¶ 6-7, a figure that Top Rx

established based on numerous business factors, including, but not limited to, Top Rx's

acquisition costs, a fact of which Plaintiff was aware no later than June 2001, and the

sales price negotiated by Plaintiff.  Defendants' Reply Memorandum at 8 (Plaintiff was

aware "during at least the last five to six years of her employment . .  no later than 2001

of the existence of such other factors") (underlining added); Defendants' Memorandum

at 7; Defendants' Fact Statement ¶ 7; King Affidavit ¶ 12; Franklin Affidavit ¶ 7.

    However, Defendants' contentions in support of summary judgment on this

element of Plaintiff's breach of contract claim fail for two primary reasons.  First,

although, as Defendants submit, Plaintiff does not dispute receiving an example of Top

Rx's "product catalog" or "Weekly Buyer Worksheets" to which Mr. King's 1991 letter

arguably refers, Defendants' Memorandum at 1-4, nothing in either Defendants' Exh. B,

the example of the "product catalog" or "Weekly Buyer Worksheets," the Top Rx

documents relied on by Defendants, or in Mr. King's fairly detailed written March 1991

proposal to Plaintiff, Defendants' Exh. A, makes any reference to the other cost factors

asserted by Defendants as used by Top Rx in arriving at such average costs.  Indeed,

Defendants' reliance on extrinsic evidence, *e.g.*, Defendants' Memorandum at 3; King

Affidavit ¶ ¶  5, 8, (referencing Defendants' Exh. B) indicates Defendants believe the

meaning of the terms of Mr. King's March 1991 letter relating to the meaning of the

"average cost" of Top Rx products is sufficiently ambiguous to warrant the use of such

evidence to resolve the ambiguity thus conceding the existence of a material issue of

fact on the correct meaning of the term "average cost" used by Mr. King's letter, thereby

defeating Defendants' request for summary judgment on this issue.  *See Seiden,* 959

F.2d at 428 (summary judgment not available where reference to extrinsic evidence

necessary to resolve issues of intent of parties to contract).

Second, fairly read, the written context of Mr. King's sole reference, in his March

1991 letter to Plaintiff, to the use of average costs for computing Plaintiff's sales

commissions in itself provides evidence from which a reasonable juror could find that,

as Plaintiff contends, Plaintiff's Memorandum at 5, the term average cost, as used by

Mr. King in his letter, referred exclusively to Defendants' purchase costs for particular

Top Rx products that were automatically "averaged" by a computer as new products

were purchased by Top Rx, and later sold by Plaintiff.  Specifically, in discussing the

term "average costs," King stated to Plaintiff in his letter that "the computer

<u>automatically</u> <u>averages</u> <u>cost</u> <u>every</u> <u>time</u> <u>we</u> <u>buy</u> <u>new</u> <u>stock</u> at a different price."
Defendants' Exh. A at 2 (underlining added).  Because this part of Mr. King's letter
makes no reference to any other business cost or expense considerations, which
Defendants now argue were used by Top Rx to determine the average cost of a Top Rx
product, and emphasizes the automatic and periodic recalculation of the average cost
as new product is purchased by Top Rx, a reasonable inference is created that average
cost, as then mutually understood by the parties, was, for purposes of computing
Plaintiff's sales commissions, to be limited to an average of Top Rx's purchase costs,
requiring that the question be resolved by a jury.

Nothing in Mr. King's letter, nor elsewhere in the text of Defendants' Exh. B,
which assumedly was provided to Plaintiff along with the King letter, supports
Defendants' central contention that the average cost of a Top Rx product was
nevertheless to be arrived at by Defendants' additions to Top Rx's costs to purchase its
products based on any of the other factors relied on by Defendants.  Significantly,
Defendants fail to explain how such adjustments are even made by Defendants, in
accordance with standard accounting principles, applicable to Top Rx, through its
internal accounting procedures.  For example, while additions to Defendants' costs to
purchase Top Rx's products for costs related to "overhead items," "broker
commissions," or product expiration dates, King Affidavit ¶ 12; Franklin Affidavit ¶ 7,
may reasonably cause the products' costs, or expenses, to Top Rx to increase, how
"market conditions," or competitors' lower sales prices for comparable Top Rx products,
King Affidavit ¶¶ 10, 12, effect an increase in the average cost to Top Rx of a particular

Top Rx product offered for sale, is not explained.  Thus, a reasonable juror could find that when Mr. King's offer of employment, as stated in the March 1991 letter, was tendered to and accepted by Plaintiff, the parties understood that in calculating Plaintiff's commissions, Top Rx's average cost of product acquisition, as regularly computed by Top Rx's computer, was the only amount to be subtracted from the price at which Plaintiff was able to sell Top Rx's products.

That Plaintiff periodically requested and received reductions or "adjustments" in the average cost, or recommended sales price, as published in Top Rx's Weekly Buyer Worksheets, as Defendants contend, Defendants' Memorandum at 6-7, is not inconsistent with such a finding.  Such requests from Plaintiff could reasonably be seen, by a reasonable juror, as giving Top Rx an opportunity to refuse to sell at the lower sales price, proposed by Plaintiff, or to accept the lower price or reduction in average cost as Plaintiff requested and thereby agree to absorb the resultant decrease in profits, or a potential loss to Top Rx, on the particular sale while preserving Plaintiff's commission incentive.  Defendants imply, without support, that Plaintiff would not have requested such "adjustments" if she believed they could result in an economic loss to Top Rx on the particular sale, *i.e.*, a sale price below average acquisition cost, and thus Plaintiff must have realized Top Rx's average cost included factors other than purchase costs.  Defendants' Memorandum at 7.  However, Defendants' implication ignores that under her alleged contract with Top Rx, based on Mr. King's March 1991 letter permitting Plaintiff to "make your own prices, and not turn down orders,"  Defendants' Exh. A at 6, Top Rx expected that such profit-lowering or loss producing "adjustments"

for Plaintiff's sales could, and would, occur given Plaintiff's contract specifying the more limited meaning of average cost as Plaintiff contends.   A reasonable juror, based upon Mr. King's letter, could also reasonably find that because Mr. King was so patently desirous to hire Plaintiff to gain her superior sales skills to improve Top Rx's sales, ("that is how much faith I have in you," "there are very few aggresive [*sic*] (go-getters) like yourself," "if you come to work for me, I will be very lucky," "I am greedy only for business") (Defendants' Exh. A at 4-5), King agreed to the particular definition of average cost, as Plaintiff claims, as a specific inducement to secure Plaintiff's employment.   The jury could thus find that such high sales productivity from Plaintiff, as anticipated by Mr. King, would more than offset any occasional reductions in Top Rx's profits, or even losses, based on Plaintiff's requested "adjustments," and sales.   At best, from Defendants' perspective, the use of the term "average cost" in Mr. King's 1991 offer to Plaintiff creates a degree of ambiguity sufficient to require trial and the use of parol evidence to assist the jury in resolving such ambiguity.   *See Seiden,* 959 F.2d at 428.

Nor do Defendants point to any evidence rebutting Plaintiff's reliance on Defendants' True Inventory Cost Reports, Plaintiff's Exhs. C and D, as demonstrating that Defendants used a different accounting system to establish average costs than was provided to Plaintiff, through the Top Rx catalog or internal Weekly Buyer Worksheets, and inconsistent with Mr. King's representation that Plaintiff would receive "all information."   Plaintiff's Exh. B at 5; Gallegos Affidavit ¶¶ 13-15.   Moreover, Defendants' contentions in support of summary judgment on this element of Plaintiff's contract claims ignore the averments of Mr. Michael Duke, a former Top Rx sales manager at

20

Top Rx's Bartlett, Tennessee office submitted in opposition to Defendants' motion. During his employment with Top Rx, Duke was provided with two lists of product costs by Top Rx, one that stated "the <u>actual</u> average cost," and the other which stated the average cost of Top Rx products, an amount "much greater than the <u>actual</u> average cost."  Duke Affidavit ¶ 6 (underlining added).  According to Duke, the "average cost" listed by Defendants in the catalog or Weekly Buyer Worksheet, was substantially increased, or "manipulated" by Defendants so as to reduce Defendants' "profit margin" on Top Rx's products, thus resulting in lower sales commissions to Top Rx's sales staff, including Plaintiff.  *Id.* ¶¶ 5-6, 11.  Duke also avers Plaintiff was unaware of this dual computation and listing of Top Rx's product costs.  *Id.* ¶¶ 9, 11.  Such evidence further points to the ambiguity in the meaning of the term "average cost" as used in Mr. King's March 1991 letter to Plaintiff.  While Mr. Duke stated that Top Rx's "Average Cost" was not Top Rx's "actual average cost," Duke Affidavit ¶ 7, if the jury equates "actual average cost," as described by Duke, with Plaintiff's alleged meaning of "average cost," *i.e.*, Top Rx's costs to acquire its products, Duke's evidence will provide further support to Plaintiff's claim.  Although Duke's knowledge accrues in 1993, Duke Affidavit ¶ 1, and Plaintiff's alleged contract commenced in 1991, the proximity of Duke's knowledge to the start of Plaintiff's employment with Top Rx renders Duke's averments admissible for the purpose of Defendants' motion.  Fed.R.Evid. 401, 402 (relevant evidence, *i.e.*, that which makes fact in issue more probable, is admissible).

Defendants also argue that Plaintiff is asserting, contrary to her allegations and deposition testimony, that her commissions were to be based on "actual average cost," an allegation that, according to Defendants, improperly alters the relevant facts

originally alleged in support of her claim and established by Plaintiff's deposition testimony and affidavit opposing Defendants' motion.  Defendants' Reply Memorandum at 2-4.  However, the court finds no such improper variance in Plaintiff's allegations and evidence in opposition to Defendants' motion; rather, Plaintiff's references in her affidavit to "actual average cost," Gallegos Affidavit ¶¶ 12, 16, 18, fairly read, merely reiterate Plaintiff's essential claim that Defendants breached her contract by using an artificially inflated average cost in computing her commissions instead of the "actual average cost," *i.e.*, the average cost calculated by regularly averaging Top Rx's costs of purchasing its products only, sold by Plaintiff.  As Mr. Duke stated, if Plaintiff's contract with Top Rx was intended to require the use of "actual average cost" by Top Rx in computing Plaintiff's commissions, then based on his understanding of Defendants' internal accounting system regarding the costs of Top Rx products, which, according to the Top Rx True Cost Reports, distinguishes between a product's higher "Average Cost," and its lower "True Cost," Plaintiff was underpaid by Top Rx.  Duke Affidavit ¶ 11 ("If [Plaintiff] was to be paid commissions based on the actual average cost . . . she was underpaid.").  Based on this extrinsic evidence, if the jury finds "True Cost," as Plaintiff and Mr. Duke averred, and as used in the Top Rx True Cost Reports, and "average cost" described in Mr. King's letter offer to Plaintiff, are equivalent terms, it could infer the average cost used to calculate Plaintiff's sales commission was "manipulated" by Defendants, Duke Affidavit ¶ 5, and that Plaintiff's breach of contract claim is meritorious.  Moreover, despite Defendants' objection to Plaintiff's use of the adjective "actual," Defendants' Memorandum at 9; Defendants' Reply Memorandum at 4, in listing the factors Top Rx used to establish its products average cost, Mr. King also refers,

22

*inter alia*, to "the <u>actual</u> cost paid for the product by Top Rx . . .."  King Affidavit ¶ 12 (underlining added).  Accordingly, Plaintiff's use of the phrase "actual average cost" is not at variance with her allegations and the issues presented on Defendants' motion, and, Defendants' objections to Plaintiff's use of the word "actual" in opposing Defendants' motion, is thus meritless.

Alternatively, if the jury finds, as Defendants contend, that the term "average cost" as used in Mr. King's letter refers to the "average cost" established and published by Top Rx in its catalog and Weekly Buyer Reports, using the factors cited by Defendants, regardless of the average of the "actual" purchase costs incurred by Top Rx, King Affidavit ¶ 12, then a reasonable juror could determine that no breach of Plaintiff's contract occurred.

Accordingly, the court finds the term "average cost" as used in Mr. King's 1991 letter to be ambiguous, and that, in addition to Defendants' reliance on extrinsic evidence, Plaintiff has presented extrinsic evidence, Gallegos Affidavit ¶ ¶ 10, 12; Duke Affidavit ¶ ¶ 5-7; and the Top Rx True Cost Reports, Plaintiff's Exhs. C and D, sufficient to assist the jury in resolving such ambiguity, *see Seiden, supra,* in the event the jury also finds Mr. King's letter to be an enforceable contract with Plaintiff.  As such, a material issue of fact as to the definition and scope of the term "average cost," as one of the controlling elements for the correct computation by Top Rx of Plaintiff's sales commissions, is presented.  Accordingly, Defendants' motion, directed to Plaintiff's breach of contract claim, on this ground should be DENIED.

3.      **Waiver and Estoppel**

Defendants also seek summary judgment on Defendants' affirmative defenses of

waiver and estoppel arguing that Plaintiff waived her claim, based on Defendants'

alleged breach of contract, to additional commissions and should be deemed estopped

from asserting a claim for breach of contract against Defendants because Plaintiff

admits she continued to receive commission payments under the alleged contract with

Top Rx without protest.  Defendants' Memorandum at 11-13; Defendants' Reply

Memorandum at 7; Plaintiff's Deposition I at 84-85; Plaintiff's Deposition II at 13-16.

Specifically, Defendants rely on Plaintiff's testimony that from time-to-time Plaintiff

received permission from Top Rx to sell products at less than the average cost stated in

the product catalog or Weekly Buyer Worksheets, and that she learned upon receipt of

the June 2001 Memorandum, at the latest, that the average cost of a Defendants'

product was based on a number of factors that resulted in an amount greater than only

the cost of acquisition by Top Rx for its products, but did not complain to Defendants

that her commissions had been improperly reduced by Defendants for fear of losing her

well-paid employment with Top Rx.  Defendants' Reply Memorandum at 7-8 (citing

Plaintiff's Deposition I at 84; Plaintiff's Deposition II at 13-16).  Defendants further

contend that as of the date Plaintiff signed the June 2001 Memorandum, of which

Plaintiff does not contest she received a copy, if not well before that time, and, in any

event, sometime prior to termination of her employment with Top Rx in 2004, Plaintiff

fully understood the establishment of average costs of Top Rx's products in 2004 as

used for computing Plaintiff's sales commissions, but did not object to it and continued

to accept payment of less than the correct amount of such commissions which Plaintiff

now claims Defendants owe her.  Defendants' Memorandum at 10.  Additionally,

Defendants argue, Plaintiff had reason to suspect early in her employment with

Defendants that Defendants were not adhering to her contract and Plaintiff was

confronted with complaints from her sales staff that Defendants were improperly setting

higher product average costs for commission purposes effectively reducing their sales

commissions.  Defendants' Memorandum at 10 n. 3 (citing Plaintiff's Deposition I at 85).

Under New York law, in contract disputes, a waiver is established through the

"voluntary and intentional abandonment of a known right which, but for the waiver,

would have been enforceable."  *Nassau Trust Co. v. Montrose Concrete Prods. Corp.*,

436 N.E.2d 1265, 1265 (N.Y. 1982); *see also Mitchell v. Leahey*, 734 N.Y.S.2d 780, 780

(4th Dep't 2001) ("waiver is the intentional relinquishment of a known right").  "The intent

to waive 'must be unmistakably manifested, and is not to be inferred from a doubtful or

equivocal act.'" *Ess & Vee Acoustical & Lathing Contractors, Inc. v. Prato Verde, Inc.*,

702 N.Y.S.2d 38, 38 (1st Dep't 2000).  "[W]here a party to an agreement has actual

knowledge of another party's breach and continues to perform under and accepts the

benefits of the contract, such continuing performance constitutes a waiver of the

breach."  *Nat'l Westminster Bank, U.S.A. v. Ross*, 130 B.R. 656, 675 (S.D.N.Y. 1991)

(citing New York caselaw), *aff'd sub nom.*, *Yaeger v. Nat'l Westminster*, 962 F.2d 1 (2d

Cir. 1992); s*ee N.Y. Racing Ass'n v. Meganews, Inc.*, 2000 WL 307378, at * 7 (E.D.N.Y.

2000) (citing New York caselaw) (plaintiff waived its breach of contract claim for

allegedly unauthorized monthly deductions defendant made "by continuing performance

under the contract and accepting the benefits of the contract despite allegedly

unauthorized deductions."); *compare Mitchell*, 734 N.Y.S.2d at 780 (plaintiff who

received low commissions "under protest" did not waive breach of contract claim).

Whereas, under New York law, waiver requires "'that the party to be estopped be aware of certain facts and, being aware of them, elect not to take advantage of them,'" *Chapin v. Chapin,* 744 N.Y.S.2d 181, 183 (2d Dep't 2002) (quoting *Savasta v. 470 Newport Assocs.*, 579 N.Y.S.2d 167, 169 (2d Dep't 1992), *aff'd*, 623 N.E.2d 1171 (N.Y. 1993)), a plaintiff is estopped from pursuing a breach of contract claim when such plaintiff has "accepted the benefits of [the] agreement, despite knowledge of a breach of the agreement interposed in a subsequent breach of contract action." *Id.* (citing *Savasta*, 579 N.Y.S.2d at 169).

Here, as discussed, Discussion, *supra*, at 10-23, not only is a trial required to establish the meaning of the term "average cost" as used in Mr. King's 1991 letter to Plaintiff, trial is also required to establish whether Plaintiff in fact knew of its correct meaning as argued by Defendants.  However, it is unclear, based on this record, whether Plaintiff, prior to commencing this action, learned that Top Rx misrepresented to Plaintiff how Top Rx established the average costs for its products that were then listed in the catalog and Weekly Buyer Worksheet and used to compute Plaintiff's commissions.  Plaintiff admits that, well prior to 2001, her sales employees expressed to her their concerns that the average cost stated in the Top Rx Weekly Buyer Worksheets may not have been correctly and uniformly established by Top Rx.  Plaintiff's Deposition I at 85-88.  Plaintiff also agrees she received a copy of the June 2001 Memorandum indicating to Top Rx sales staff that Defendants utilized several factors other than purchase price to establish the average cost of its products.  Gallegos Affidavit ¶ 15.  However, Plaintiff also has averred she was, until after her termination in 2004, unaware

of the facts upon which she alleges Defendants breached the employment contract with

Plaintiff for proper computation of her sales commissions when she, for the first time,

saw a copy of one of  Top Rx's True Cost Reports, which purportedly listed Top Rx's

true purchase costs of the products, as well as their respective average costs.  Gallegos

Affidavit ¶¶ 13, 19.  No explanation of the term "True Cost" as stated in the True Cost

Reports is provided by Defendants.  Moreover, Plaintiff believed the June 2001

Memorandum did not apply to her, because she had a different agreement with Top Rx

for computing commission based on Mr. King's March 1991 letter to her.  Gallegos

Affidavit ¶ 16.  Upon this evidence, the court finds that a reasonable juror could find

Plaintiff did not, and reasonably could not have, understood the June 2001

Memorandum as applicable to Plaintiff given that Plaintiff had then been employed by

Defendants for 10 years under the terms of Mr. King's 1991 letter which contained

specific terms for her employment, including the term at issue in this case, governing

computation of her commissions and therefore had no reason to believe Defendants

had breached her contract because of the complaints she received from her sales staff

concerning the basis for Top Rx's published average costs pertaining to the proper

computation of their commissions.  Accordingly, summary judgment is not warranted on

Defendants' contention that prior to instituting this action Plaintiff was, as a matter of

law, fully aware of the facts upon which her breach of contract claims is based.

          To establish the defense of waiver to a contract claim, in addition to awareness

of the facts upon which the alleged breach is predicated, a plaintiff's forbearance in

seeking judicial relief timely must also be shown to be a voluntary and intentional

decision.  *See Nassau Trust Co.,* 436 N.E.2d at 1269-70 (waiver must be both voluntary

and intentional).  Here, Plaintiff's deposition testimony, upon which Defendants rely,

creates a material issue of fact on this requirement for Defendants' waiver defense.  As

relevant, Plaintiff's deposition includes the following testimony

> Q.    After you received this memo in June of 2001 did you go to anyone
>        at Top Rx and say I need a different set of cost figures since I have
>        a different deal than what these sales reps have?
>
> A.    I spoke with Bill briefly, but I needed my job.
>
> Q.    So you did have a discussion with Bill Maher?
>
> A.    Briefly.
>
> Q.    And what was the substance of that discussion?
>
> A.    There is a lot of problems with cost.  I know I'm not getting the right
>        cost but I'm not rocking the boat.

Plaintiff's Deposition I at 82-83 (underlining added).

Plaintiff's testimony that she chose not to "rock the boat" because she "needed" her job

supports a reasonable juror's inference that even if Plaintiff, upon learning of the

underlying facts establishing Defendants' breach, could be said to have forgone her

claim against Defendants because Plaintiff feared for loss of her job if she pursued the

issue with Top Rx by discussion or legal action, such acquiescence was not voluntary.

Given the evidence in this record, a reasonable juror could find that Plaintiff's expressed

fear that pursuing the issue with Defendants would, informally or formally, result in

termination and loss of substantial income, was both reasonable and well-founded, thus

negating any asserted waiver of Plaintiff's breach of contract claim for lack of

voluntariness.  Moreover, under New York law, the question of waiver as to an alleged

breach of contract is a matter of intent and as such presents a question of fact requiring

28

unambiguous proof. *Edrei v. Copenhagen Handelsbank A/S,* 1991 WL 64201 *11

(S.D.N.Y. April 18, 1991) (citing *Alsens American Portland Cement Works v. Degnon*

*Contracting Company*, 118 N.E. 210, 210 (N.Y. 1917) (waiver of contract rights based

on "conduct, or language of a party, is <u>rarely</u> established as a matter of law.")

(underlining added)).  *See also Jumax Associations v. 350 Cabrini Owners Corp.,* 849

N.Y.S.2d 35, 38 (1st Dep't 2007) (McGuire, J. dissenting) (citing *Alsens Am. Portland*

*Cement Works, supra*, and observing triable issue of fact as to whether plaintiff's

actions could be construed as relinquishment of right should preclude summary

judgment).  In sum, Defendants' evidence in support of its waiver defense requires trial.

      Defendants' reliance on *Savasta,* 579 N.Y.S.2d 167, and *El Reda v. Love Taxi,*

*Inc.,* 608 N.Y.S.2d 656 (1st Dep't 1992), Defendants' Memorandum at 13, in support of

Defendants' argument that Plaintiff should be found to be estopped, as a matter of law,

from asserting her breach of contract claim because Plaintiff, despite her awareness of

Defendants' breach of contract in underpaying her sales commissions, continued to

receive benefits under the contract, is misplaced.  *Savasta, supra,* and *El Reda, supra,*

are readily distinguishable from the record on Defendants' motion in this case as in both

those cases the facts demonstrate plaintiffs were well-aware of all relevant information

which could constitute plaintiffs' later asserted breaches of their respective contracts

yet, despite defendants' arguable breaches, continued to accept the benefits of the

disputed business arrangements at issue in each case and, based on a fair reading of

the decisions, no evidence cast doubt on the voluntariness of plaintiffs' decisions not to

seek to enforce those agreements to plaintiffs' benefit.

      Here, at a minimum, evidence in the instant record creates material issues of fact

regarding (i) when Plaintiff learned, prior to suit, that Defendants had in fact substantially underpaid her commissions sufficient to establish an intentional abandonment of a known benefit as required for Defendants' waiver and estoppel defenses; (ii) whether at the time Plaintiff first became aware of the asserted breach Plaintiff knew that Defendants were maintaining an accounting system that produced both a "true" product cost, and the "average product cost" listed in the Weekly Buyer Worksheet, a fact contrary to the specific representation in King's 1991 employment offer to Plaintiff that no information would be withheld from Plaintiff (Defendants' Exh. A at 5); and (iii) whether Plaintiff's fear of termination by Top Rx if she pursued these issues with Top Rx by complaining about a possible underpayment of her commissions or threatening legal action was reasonable and her failure to pursue litigation against Defendants thus voluntary.  Here, the record contains evidence, Gallegos Affidavit ¶ ¶ 13-16, Duke Affidavit ¶ ¶ 5, 7-10, and Top Rx's True Cost Reports, Plaintiff's Exhs. C and D, from which a reasonable juror could find that during her employment with Defendants, Plaintiff was not fully informed of the extent of Defendants' underpayment of Plaintiff's commissions in violation of her contract with Defendants and, based on her legitimate fear of loss of employment and significant income, did not voluntarily relinquish her contractual rights.  Further, Plaintiff's deposition testimony, Defendants' only evidence in support of these defenses, also creates issues of material fact going to the voluntariness of Plaintiff's alleged inactions.  Thus, material issues of fact, upon which the validity of Defendants' waiver and estoppel defenses depend, are presented on this record and summary judgment is therefore unwarranted.  As such, Defendants' motion, upon these defenses, should be DENIED.

**4.     Plaintiff's Failure to File a Statement of Uncontested Facts.**

Defendants also assert that because Plaintiff failed to file a statement of disputed

material issues of fact, in accordance with Local Rule of Civil Procedure 56.1, all of

Defendants' statements of undisputed material fact (Doc. No. 31) ("Defendants'

Statement") are conceded, and therefore support summary judgment.  Defendants'

Reply Memorandum at 2 n. 1.  While the court does not condone Plaintiff's failure to file

the required statement, its own review of Defendants' Statement reveals no assertions

of fact, which, even if treated as conceded based on Plaintiff's failure to file a counter-

statement, require that Defendants' motion be granted.  For example, Defendants argue

that it is "undisputed that Plaintiff knew right from the beginning that the average cost

listed in the [Top Rx] sales catalog was <u>not</u> the actual cost paid for the product by Top

Rx."  Defendants' Memorandum at 7 (underlining in original).  However, Defendants fail

to cite to anything in the record to support this assertion, and a careful reading of

Defendants' statement fails to reveal any statement of fact consistent with Defendants'

assertion.  In particular, at paragraphs 8 and 9 of Defendants' Statement, Defendants

maintain that Mr. King provided Plaintiff with a copy of an example of Top Rx's product

catalog "to assist Plaintiff in her consideration of whether to go to work with Top Rx,"

and that the catalog or "Buyer Worksheet" . . . "listed the average price and suggested

sales price of each [Top Rx] product."  Neither statement, however represents that

Plaintiff was thereby made aware that average price was not exclusively to be based on

the acquisition cost of the product to Top Rx as Plaintiff alleges.  Further, Defendants

claim that it is an undisputed fact, that "in setting the cost of the product, Top Rx took

into account a number of factors . . .."   Defendants' Fact Statement ¶ 17.  Significantly,

31

however, such assertion fails to direct itself to the precise issue of fact in this case, *i.e.*, the correct meaning of the term "average cost" as stated in Mr. King's 1991 letter; rather Defendants' statement of fact simply refers to "the cost" of Top Rx's product.  Thus, Defendants' reference in this paragraph of Defendants' Fact Statement to "the cost of the product" does not explain to which of Top Rx's "costs" this statement of fact was intended by Defendants to refer – "actual," "average," "true," "standard," or "last." Therefore, even if conceded, such "fact" is not fatal, as a matter of law, to Plaintiff's breach of contract claim.

In sum, even if Plaintiff is deemed to have conceded such undisputed facts as set forth by Defendants in support of Defendants' motion, Plaintiff's "concessions" are not determinative, predicated on the application of Local Rule 56, of the issues upon which Defendants' motion turns.  Additionally, the other statements, related to Defendants' affirmative defenses, Discussion, *supra,* 23-29, proffered by Defendants, merely reiterate evidence that the court discusses as relevant to Defendants' motion directed to Plaintiff's breach of contract claim.  Although Defendants' Statement, *i.e.*, ¶¶ 24-25, asserts Plaintiff failed to complain to Defendants about alleged breaches of her contract, even if conceded as facts, such facts do not require summary judgment on Defendants' waiver and estoppel defenses.  Discussion, *supra*, at 26-27.  Moreover, a district court has broad authority to overlook a party's failure to comply with local rules in the interest of justice, including where a court's own review of the record reveals a genuine issue of disputed fact critical to the case and the court is not required to deem such fact admitted merely because the nonmovant has failed to submit a required counter-statement under Local Rule 56.1.  *Giannullo v. City of New York*, 322 F.3d 139,

32

140 (2d Cir. 2003) (citing *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 74 (2d Cir. 2001)

("[t]he local rule does not absolve the party seeking summary judgment of the burden of

showing that it is entitled to judgment as a matter of law, and a Local Rule 56.1

statement is not itself a vehicle for establishing factual assertions that are otherwise

unsupported in the record.")).


## CONCLUSION

Based on the foregoing, Defendants' motion (Doc. No. 31) as directed to

Plaintiff's breach of contract claim should be DENIED; and, as directed to Plaintiff's

fraud, employment discrimination and retaliation claims, Defendants' motion should be

DISMISSED without prejudice.

Respectfully submitted,

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE


Dated: March 12, 2008
           Buffalo, New York

Pursuant to 28 U.S.C. §636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**

*Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants

SO ORDERED.

/s/ *Leslie G. Foschio*
_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      March 12, 2008
            Buffalo, New York